## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NINETY SIXTY LLC, | ) | CIVIL ACTION NO.:  20-cv-4165 |
| | ) | |
| Plaintiff, | ) | JUDGE |
| | ) | |
| v. | ) | |
| | ) | |
| SPRINT SPECTRUM REALTY, COMPANY, | ) | **COMPLAINT** |
| L.P., as successor to Sprint Spectrum L.P. | ) | |
| 6800 Sprint Parkway | ) | |
| Overland Park, Kansas 66251 | ) | Jury Demand Endorsed Hereon |
| | ) | |
| and | ) | |
| | ) | |
| T-MOBILE USA, INC. | ) | |
| 12920 Se 38th St. | ) | |
| Bellevue, WA, 98006 | ) | |
| | ) | |
| Defendants. | ) | |

For its complaint against Sprint Spectrum Realty Company, L.P., as successor to Sprint Spectrum L.P., ("Sprint") and T-Mobile USA, Inc., as the successor-in-interest to Sprint ("T-Mobile"), Plaintiff Ninety Sixty LLC ("Ninety Sixty" or "Plaintiff"), by its attorneys, Ulmer & Berne LLC, hereby alleges and states as follows:

### INTRODUCTION

1.      Plaintiff's residential property rights, and the entitlement to the health and safety of the occupants of the residential townhouse it owns at 317 West 77th Street, New York, NY (the "Townhouse"), have, over the course of many years, been ignored, surreptitiously abused, and arrogantly and blatantly violated by a series of gross corporate actions by Sprint, and now T-Mobile.  These actions were without legal justification and have meaningfully harmed Ninety Sixty and threaten to continue to harm Plaintiff in the absence of equitable relief.  The damages are significant, as is the basis for punitive or exemplary relief.

2.      The Townhouse is immediately adjacent to another residential structure, 319 West 77th Street (the "Adjacent Property"), on which roof Sprint mounted and has thereafter continuously maintained a cell tower installation.  In 2012, Ninety Sixty informed Sprint that without any right or colorable basis it had installed its cell tower equipment on Plaintiff's property and that its antennas had encroached on the Townhouse and were exposing the Townhouse's occupants and the public to illegal levels of RF electromagnetic radiation in violation of permissible federal limits.  Ninety Sixty and Sprint resolved the matter by contractual agreement dated July 31, 2012 (the "2012 Agreement"), signed by Sprint's John Beaudoin, Senior Manager, National Contracts, and by which Sprint agreed to remove its offending equipment and not add equipment going forward that encroached upon the Townhouse.  Plaintiff relied upon Sprint's compliance with and performance of its contractual obligations.

3.      In April 2019, Ninety Sixty discovered that Sprint, in breach both of the 2012 Agreement as well as Plaintiff's independent legal rights, had failed to remove all of its equipment from the Townhouse, and thereafter also installed and affixed new equipment onto the Townhouse.  Ninety Sixty also discovered that Sprint had caused significant damage to the Townhouse's chimney and brickwork, creating danger of a collapse and physical harm to the Townhouse's occupants as well as pedestrians walking below.  Ninety Sixty promptly notified Sprint of its wrongful conduct, and demanded that corrective action be taken, including removal of the cell tower equipment attached to the Townhouse, installation of a protective sidewalk shed for pedestrian safety, and repair of the damage to the façade.  Upon information and belief, as of April 1, 2020, T-Mobile is the successor in interest to Sprint resulting from its acquisition of Sprint (Sprint and T-Mobile are collectively referred to as "Sprint").

2

4.      After a year of Plaintiff's fruitless and repeated efforts seeking corrective action, Sprint's ongoing trespass, encroachment and contractual breaches continue unabated, no compensation has been paid, and the damages to the Townhouse remain unrepaired and have continued to accrete.  Whereas Sprint did install a sidewalk shed and multistory scaffolding above the sidewalk in front of the Townhouse, it did so in a negligent and deficient manner, with the result that (i) despite prior warning of the danger, its scaffolding pulled loose from its façade anchors and threatened collapse, and (ii) emergency squads from the NYPD and the NYFD closed the street to cars and the sidewalks to pedestrians, the Townhouse's occupants were barred from entering their home, and the NYFD broke down the Townhouse door to attempt to stabilize Sprint's faulty structure using ropes tied to furnishings in the Townhouse, with significant additional damage to the Townhouse and its contents.  Sprint's scaffolding firm has been charged with legal violations by the City of New York, asserting that it "failed to safeguard persons and property", and the scaffolding was "observed in state of collapse causing extreme and immediately hazardous condition to the public and adjacent properties.  FDNY, NYPD and DOB required onsite."  Multiple government officials have contacted Sprint to express the public's concern over its conduct, including the Chair of the NY State Assembly's Committee on Corporations, Authorities and Public Commissions, stating, in part, "I consider Sprint's ongoing conduct extremely disturbing, especially for a large corporate entity that does business throughout our State."

5.      Sprint's ongoing unauthorized use of the Townhouse for its own business purposes was undertaken intentionally and surreptitiously, and constitutes both a breach of contract and a longstanding and continuing trespass.  Despite due and repeated demands by

Ninety Sixty, and written assurance by Sprint that its breaches and encroachments would cease and be corrected, Sprint has failed to do so.

## PARTIES

6.      Plaintiff Ninety Sixty LLC is a limited liability company organized under the laws of the State of New York.  Ninety Sixty is wholly owned by two members, Gerald Kerner and Louise Kerner, both of whom, as described immediately below, are citizens of New York.

7.      Non-party Gerald Kerner ("Kerner") is an individual who is a citizen of New York, residing at 317 West 77th Street, New York, NY, which is a residential property wholly owned by Ninety Sixty.  Gerald Kerner is the Managing Member and is one of two co-owners of Ninety Sixty.

8.      Non-party Louise Kerner is an individual who is a citizen of New York, residing at 317 West 77th Street, New York, NY.  Louise Kerner is one of the two co-owners of Ninety Sixty.

9.      Defendant Sprint is, or was until it was acquired by T-Mobile on or about April 1, 2020, a limited partnership organized under the laws of the State of Delaware and maintains its headquarters in Overland Park, Kansas.

10.      Upon information and belief, prior to becoming part of Sprint Spectrum Realty Company, L.P., Sprint Spectrum L.P. was jointly owned by Sprint Spectrum Holding Co., LP, an entity organized under the laws of the State of Delaware, and MinorCo. LP, an entity organized under the laws of the State of Delaware.

11.      Upon information and belief, Defendant T-Mobile is a publicly traded corporation which acquired the entirety of Sprint on or about April 1, 2020 and thereby is the successor in

4

interest to Sprint's obligations.  T-Mobile is organized under the laws of the State of Delaware and maintains its headquarters in Bellevue, Washington.

## JURISDICTION & VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

13.    In particular, because Ninety Sixty is a limited liability company, its citizenship is measured by the citizenship of its members.  Ninety Sixty is wholly owned by two individuals, Gerald Kerner and Louise Kerner, both of whom are citizens of New York who permanently reside at 317 West 77th Street, New York, NY.  Neither of the Defendants are citizens of New York.

14.    Venue is proper within this judicial district under 28 U.S.C. § 1391(b)(2), as the property in question is located in this judicial district and a substantial part of the events or omissions giving rise to the claims stated herein occurred in this district.

## BACKGROUND

15.    Plaintiff Ninety Sixty is the owner of a single family townhouse at 317 West 77th Street in the Upper West Side of Manhattan, between West End Avenue and Riverside Drive.

16.    Ninety Sixty entered into a purchase agreement for the Townhouse in October of 2011, the closing took place on March 27, 2012, and in July of 2012 the Kerners moved in.

17.    The Townhouse offered many features which attracted the Kerners' interest. Among them, were space for a large family to visit and proximity to Kerner's offices.  In addition, the house was built with a rooftop garden which has lovely views and is sunny enough to support gardening.  From a safety and privacy standpoint, the entire roof is surrounded by a

high wooden fence and railing.  After moving in, the Kerners spent a lot of time on the roof,

putting in planter containers around the perimeter, hauling soil up to the roof to fill the

containers, putting in two apple trees and a wide range of fruit, flowers and vegetable plantings.

18.     The roof of the Adjacent Property (at 319 West 77th Street), which is immediately

to the west, is one story lower than Ninety Sixty's Townhouse, and because of the high fence

surrounding the Townhouse's rooftop garden, it is not easy to look over the fence and down onto

the neighboring roof.  When Kerner did look down over the fence prior to moving in, he saw a

large installation of electronic equipment, wiring, metal cabinets and antennas on the roof of 319

West 77th Street.  He realized that he was looking at a cell phone tower site and he saw that it

had antennas attached to the Townhouse's chimney, that the antennas were painted to look like

the brickwork and thus were camouflaged; but they were clearly facing in the Townhouse's

direction and were also aimed at the front bedroom on the top floor.

19.     Kerner was already aware that cell sites generate and give off high levels of

electromagnetic radiation which can pose cancer risks, depending on where the radiation is

aimed, one's proximity to the antennas and how much power was being pumped into the

antennas, and he was concerned that what he was seeing would pose a health risk to the Kerners,

as well as to their children and grandchildren when they came to stay in New York.  The Kerners

identified and  hired V-Comm LLC (the "Engineering Firm"), an expert telecommunications

engineering firm specializing in providing engineering services to cell phone carrier companies.

The President of V-Comm LLC at all relevant times has been Dominic Villecco ("Villecco").

20.     The Engineering Firm performed Electro Magnetic Energy field measurements

and other tests to measure and evaluate the radio frequency (RF) radiation being emitted by the

cell tower site in accordance with regulations issued by the Federal Communications

Commission ("FCC") pursuant to the Telecommunications Act of 1996.

21.     The Engineering Firm, as part of its testing and analysis, utilized the Narda 8718B

RF Radiation Survey Meter and a shaped E-field isotropic probe equipped to measure power

density in percent of the FCC standard.  The Engineering Firm found that the antennas facing

east across the front of Ninety Sixty's Townhouse – which also were placed by Sprint across the

property line between the two buildings – "show[ed] a predicted maximum [radiation]level of

1312% of the FCC standard, and is thereby non-compliant with FCC Rules and Regulations"

(emphasis added), and further concluded:

> The results of the RoofView analysis indicate that the site at 319 West 77th Street is NOT
> in compliance with FCC standards for those areas accessible by the general public at the
> adjacent 317 West 77th Street residence.  Anyone who may need to perform typical
> maintenance, cleaning, etc. on the front roof area of 317 West 77th Street will be exposed
> to RF emissions levels which exceed the FCC standard.  Therefore, this area represents
> an area whereby the commercial wireless operator must take corrective action.

22.     Two of the images contained in V-Comm's written report depict the property and

antenna conditions and appearances.  In the first image, shown below, the segment in blue

illustrates the area exposed to radiation in excess of legally permitted levels in accordance with

FCC regulations applicable to cell phone antenna sites, which area extends over part of the

Townhouse.



Figure 3 - Graphical Representation of RoofView Output on Google Earth Image

23.     The second photo depicts the camouflaged antennas, which crossed the property line from the Adjacent Property to the Townhouse, and which exposed Ninety Sixty, the Kerners, and others to illegally high doses of radiation being emitted by these antennas.



Figure 8 – Beta Sector Antenna locations on 319 West 77th Street with respect to 317 West 77th Street, Close-up from front of 317 West 77th Street

24.     The Engineering Firm identified Sprint as the operator of this cell site, and contacted Sprint management to inform them of the problem and the need for corrective action. In that process, the Engineering Firm learned that Sprint had not done any on-site radiation measurements when installing, powering up, and using its equipment.

25.     After extended negotiations with senior Sprint personnel, Sprint finally disconnected and removed the offending antennas and also entered into a written agreement with Ninety Sixty on July 31, 2012 which provided in part that:

        a.   Sprint agreed to reimburse Ninety Sixty for the professional fees it paid to the Engineering Firm;

b.  Sprint agreed that it would not place equipment on the Adjacent Property's roof which would encroach on the Townhouse, or which violates the rights of Ninety Sixty.

26.  The 2012 Agreement was signed on Sprint's behalf by Mr. John E. Beaudoin, Sprint's Senior Manager of National Contracts.

27.  Ninety Sixty believed, following the signed agreement with Sprint in July of 2012, that Sprint had complied with the agreement and was continuing to do so.

**Sprint Violates the 2012 Agreement and Trespasses on Ninety Sixty's Property**

28.  In the first week of April 2019, a notice was posted along West 77th Street that in the coming week the street would be closed so that a crane could lift equipment onto the roof of the Adjacent Property.  After seeing that notice, Kerner went up to the Townhouse roof to see what Sprint was doing and if there was anything new on the roof of 319 West 77th Street.

29.  To his surprise, Kerner was able to see that Sprint had (i) installed new antennas, painted to be camouflaged, against his chimney, (ii) installed new cabling connecting to those antennas, and (iii) deployed various pieces of new equipment on the roof of the Adjacent Property.

30.  During the following week, when the street was closed to traffic and a large crane was positioned in the street and deployed to hoist equipment onto the roof of the Adjacent Property, Kerner spoke to the crane's work crew and was told that Sprint hired them to hoist new, heavy equipment onto the roof to upgrade the cell site to new 5G technology.

31.  Ninety Sixty again hired the Engineering Firm to obtain their professional assistance in evaluating Sprint's activity.  The Engineering Firm, after examining photos provided by Kerner, confirmed that Sprint was proceeding to install 5G cell tower equipment on the roof of the Adjacent Property.

9

32.     In April 2019, Villecco telephoned Sprint senior executives with responsibility for the New York City area and advised them about the 2012 Agreement with Ninety Sixty, which they said they were unaware of.  Villecco, explained that Sprint's installation of 5G equipment violated the 2012 Agreement. Villecco also arranged for a site meeting with them on the roof of the Adjacent Property in May 2019.

33.     The Engineering Firm conducted two site visits, one in May 2019 and one in July 2019.  Villecco attended the July 2019 joint site visit.  During that visit, Villecco saw new cabling attached by Sprint to the Townhouse, and new antennas and support fixtures as well, with the poles and antennas painted a matching color to make them less visible from the street. He also noticed a large hole that had been punched into the Townhouse's chimney on the side facing west and which was thus not visible from the roof of the Townhouse.

34.     Kerner had never been on the roof of the Adjoining Property, and was unable when standing on the Townhouse's roof to see the western side of the chimney which faced away from him, nor the area at the bottom of the wall facing the Adjacent Property.

35.     Subsequent to Villecco's site visit, Kerner was able to use a selfie stick to extend his cell phone camera in order to see the areas previously not visible to him, and thereby first became aware of (i) new equipment attached to the Townhouse by Sprint without permission or right, and in violation of the 2012 Agreement, (ii) older cabling running the full length of the Townhouse brick wall and  drilled by Sprint into it in multiple places in violation of the 2012 Agreement, (iii) a large metal grill platform with a steel cross girder bolted into the Townhouse's wall, which supports Sprint's heavy equipment cabinets for 5G and other equipment, also without permission or right and in violation of the 2012 Agreement, and (iv) damage to the Townhouse's chimney, wall and façade by Sprint's illegal actions.

36.     The following photos were taken by Kerner at that time:



The above photo shows the side and back of the new, painted antenna and support pole, the new cabling and box which are attached to the wall, and the damage to the far side of Ninety Sixty's chimney.

37.     The below photo shows the cabling on the right which is drilled into the

brickwork and the large support platform supported by a girder which has been bolted into the

north end of the Townhouse's brick wall.



38.    The next photo, shows another view of the cables and their multiple supports attached to the Townhouse's brick wall, as well as the girder bolted to the same wall, with the grill platform resting upon it.



39.     The following photo from Villecco's site visit to the roof of the Adjacent

Property with Sprint executives in July 2019, shows the girders and cell equipment bolted by

Sprint to the southern end of the Townhouse's brick wall:



**<u>Ninety Sixty Immediately Demanded that Sprint Cease Violations of
Property Rights and Breaches of the 2012 Agreement</u>**

40.     Having become aware of Sprint's blatant violation of the 2012 Agreement by

appropriating for its cell site use Ninety Sixty's property without any right or legal basis

whatsoever, Ninety Sixty repeatedly demanded that Sprint vacate its property, comply with the

2012 Agreement and repair and pay for its violations.  Likewise, the Engineering Firm so

informed Sprint on behalf of Ninety Sixty.

41.     In or about May and June of 2019, in response to the Engineering Firm's demand

that Sprint respond as to when it would vacate Ninety Sixty's property, Sprint informed Villecco

and Ninety Sixty that Sprint was seeking to find an alternative means for attaching and

physically supporting the weight of its equipment on the roof of the Adjacent Property so that it

would no longer use the Townhouse, but that it would take some time to determine if there was a feasible engineering alternative.  As a result, Sprint failed to commit to any deadline for removing its encroachment on the Townhouse.

42.     Sprint's initial construction of the cell site on the roof of the Adjacent Property, and its subsequent upgrades and alterations to that site, required Sprint to obtain government permits from New York City, including permission from the New York Landmarks Commission. In order to obtain the required permits, Sprint was required to submit for government review and approval its detailed plans for the specific layout of equipment and construction of the cell site.

43.     Sprint's cell site on the roof of the Adjacent Property differs in fact from its construction plans filed as part of its permit applications with the government to obtain the required approvals, and upon information and belief Sprint has never self-reported nor admitted to New York authorities that it had deviated and that the permits obtained, including Landmarks Commission approval, had been secured using materially false and misleading application materials.

44.     During the site visit by Villecco and Sprint executives in July 2019, one of the Sprint executives volunteered the statement to Villecco that its cell site did not conform to Sprint's construction plans.

45.     In June of 2019, Ninety Sixty sent a letter to Sprint's General Counsel at its corporate headquarters in Kansas, informing him of the facts and the failures of Sprint's executives with responsibility for the New York area to address the problem, and demanding that Sprint vacate the premises and address the damage that it had caused in violation of the 2012 Agreement, and state and federal law.  Sprint's General Counsel never responded to Ninety

Sixty's letter, nor did any other person in the General Counsel's office, nor has Sprint undertaken the necessary remedies, and Sprint continues to occupy and illegally use the Townhouse.

## Sprint Failed to Remedy the Violations of Rights

46.     On information and belief, Sprint proceeded with the installation, launch, and use of the 5G equipment on the roof of the Adjacent Property and attached its equipment to the Townhouse, including the new antenna installation, without ever performing any on-site radiation test or monitoring to determine if it was again exposing the Townhouse, the Kerners and other members of the public to illegally high levels of electro-magnetic radiation in excess of permitted federal radiation levels.  Sprint's conduct reflects shocking indifference to its responsibilities in light of the fact that its senior management was well aware that its installation at this same location previously exposed the Townhouse, the Kerners and others to illegal radiation levels at more than 13 times the legal limit when it had also failed to conduct any on-site testing or monitoring.  Now it acted the same way yet again.

47.     In July of 2019, in response to Ninety Sixty's repeated demands, Sprint removed and relocated the antennas and cables which had been attached to the Townhouse, but a relocated antenna remained in proximity to the Townhouse, and was aimed in its direction, and Sprint also failed to remove all of its other equipment attached to the Townhouse, which persists to date. Sprint failed to confirm that the antennas were officially turned off until August 20, 2019.

48.     The attachment by Sprint of its unauthorized cell equipment, girders, antennas and supporting fixtures to the chimney, brickwork, and façade of the Townhouse damaged the chimney and its brickwork and created a hazardous and unsafe condition for the Kerners and for pedestrians walking on the sidewalk in front of the Townhouse and in front of the Adjacent Property.  Ninety Sixty brought this hazard to Sprint's attention and demanded remedial action.

49.     During the summer of 2019, Ninety Sixty repeatedly urged Sprint to take immediate action to protect pedestrians from the unsafe and unstable condition of the chimney as a result of the damage done by Sprint.

### Additional New Unlawful and Damaging Acts by Sprint

50.     In late July and early August of 2019, in order to provide a protective covering for pedestrians and residents from the danger of falling brickwork and pieces of façade from the damaged chimney, Sprint erected a sidewalk shed in front of the Townhouse , and also erected on top of the sidewalk shed a multistory metal scaffold wrapped in netting.   The scaffolding was physically attached by Sprint to the front of the Townhouse by drilling into its façade.

51.     On August 28, 2019, Ninety Sixty sent the following communication to Sprint regarding the scaffolding:

> "Now that we are entering the hurricane season in earnest, I would like Sprint to be sure that the scaffold set up is secure for purposes of safety in terms of high winds and storms. For example, there are two of the large green wood side panels that are sitting on the top of the sidewalk bridge which are loose, not attached to anything, and apparently serving no useful purpose now or going forward.  I assume they were left there as an oversight or for the convenience of the installers, and I also assume that it would be a good idea for Sprint to remove them, along with any other loose pieces of wood or equipment.  Sprint should also assure that the scaffold itself is adequately secured for storms so that it does not topple over or scrape against the façade and cause damage or injury."

Emphasis added.

52.     Upon information and belief, Sprint ignored this request over a period of more than 5 months and failed to take adequate measures as the season changed to Fall and then Winter to assure that the scaffolding was secured against storms so that it would not topple over.

53.      Friday, February 7, 2020, was a windy day and Sprint's scaffolding, still wrapped in netting in front of the Townhouse, pulled loose from its façade attachment points and was swaying dangerously in the wind.  The Kerners were not at home.  The Police and Fire Departments were alerted by one or more unknown persons, and when they arrived they

16

evaluated the status of the scaffold, and immediately took emergency action to close off West 77th Street to traffic and the sidewalks to pedestrians for fear that the swaying multistory steel scaffolding would topple over and injure or kill people.

54.     When the Kerners arrived home that afternoon, the street and sidewalks were blocked off, emergency vehicles were present, and the Kerners were barred from approaching and entering the Townhouse.  The New York Fire Department had broken down the door on the roof of the Townhouse, destroying the door and door jamb and a section of the exterior wall, entered the house, and using ropes which they tied at one end to the scaffolding outside the windows on the upper floors, they tried to stabilize the swaying structure until the scaffolding could be dismantled.  The other ends of the Firemen's ropes were tied inside the house to furniture and fixtures.  In the process, a window was broken and other damage, both inside the house and on the roof, was suffered.  After the Fire Department departed from the Townhouse after tying the scaffolding to the inside of the house, the Kerners were permitted to enter the Townhouse.

55.     New York City emergency personnel also contacted Sprint's scaffolding company that day and required their immediate presence to dismantle the scaffolding.  A work crew arrived later that afternoon and worked into the night from inside the Townhouse bedrooms to dismantle and lower the scaffolding and netting.

56.     At or about 9 pm on Friday, February 7, 2020, an inspector of the New York City Building Department who had also come to the scene along with the Fire and Police Departments, rang the Townhouse doorbell and apologetically stated that he was obliged to post a Stop Work Order on the front door of 317 West 77th Street as well as violation notices.  He stated that he realized that neither Ninety Sixty nor the Kerners had not done anything wrong and

were not responsible for what had occurred, but that since the scaffolding had been erected in connection with their address, that is where the notices had to be posted.  The Stop Work Order, however, applied to both Sprint's scaffolding contractor and Ninety Sixty.

57.    The violation notices stated that Sprint's scaffolders "failed to safeguard persons and property", and the scaffolding was "observed in state of collapse causing extreme and immediately hazardous condition to the public and adjacent properties.  FDNY, NYPD and DOB required onsite."  The notices state that the fines for the violations are $50,000.

### Property Violations and Dangerous Conditions Remain Unresolved by Sprint

58.    The chimney and loose brickwork have not been repaired, the scaffolding has not been re-constructed by Sprint though it is required for safety reasons, and neither Sprint nor its contractor has paid the fines and secured permission to re-erect the scaffolding.  Thus, the unsafe condition it created persists.  The notices of violation and the Stop Work Order remain in place, attached to the Townhouse front door.

### Public's Interests Impacted by Violations

59.    Sprint's unlawful conduct has not only damaged Ninety Sixty, but it has also been contrary to the public interest with the result that several New York State officials have voiced their concerns to Sprint.  For example, on March 3, 2020, Assemblywoman Amy Paulin, who is the Chair in the New York State Assembly's Committee on Corporations, Authorities and Commissions, wrote to Sprint's General Counsel stating in part as follows:

> I write to express my growing concern with respect to the installation of Sprint cellular equipment upon the premises of 317 West 77th Street in Manhattan. Sprint never obtained the right to use that site. Further, despite having received remedial requests and objections by the owner of that building, Sprint has subsequently failed to take corrective action during the ensuing period, now nearly a year. As Chair of the NYS Assembly's Committee on Corporations, Authorities and Commissions, I find Sprint's initial conduct very troubling.  I am even more troubled with respect to its knowing and ongoing failure to take corrective action.

…

Just a few weeks ago, scaffolding which Sprint erected in front of the premises and the neighboring building posed a public safety hazard, with the result that the NYC police, the FDNY and the NYC Department of Buildings were called onsite. They closed the street to pedestrian and vehicular traffic, and they barred the residents of 317 West 77th Street from entering their home, which suffered considerable damage as a result of the scaffolding problem. New York City has charged that Sprint's contractor failed to safeguard persons and property, and the scaffolding was "observed in state of collapse causing extreme and immediately hazardous condition to the public and adjacent properties. FDNY, NYPD and DOB required onsite."  These violations are now scheduled for trial.

I consider Sprint's ongoing conduct extremely disturbing, especially for a large corporate entity that does business throughout our State. I have notified the Public Service Commission of my serious concern and have advised the homeowners to work with their representative in Congress to alert the FCC to this behavior as well.

If any of the foregoing facts are incorrect, I would welcome hearing from you. If they are accurate, I would appreciate a response indicating that Sprint will take all necessary actions to ensure both that the homeowners on West 77th Street are made whole for the damage to their home and that the kind of trespass described above will not happen again to them or to any other residents of this State.

Emphasis added.

60.    Upon information and belief, neither Sprint's General Counsel nor any other Sprint personnel responded to Assemblywoman Paulin's requests, either to assert that her factual statements were incorrect or to confirm that Sprint was taking corrective action.

61.    On February 12, 2020, Assemblywoman Linda B. Rosenthal, a member of the New York State Assembly's Committee on Housing, wrote to the Chief Executive Officer of Sprint, stating as follows:

According to Mr. Kerner, in 2012 Sprint, unilaterally and without permission, installed cell phone equipment on the chimney of his building at the above referenced building. Sprint removed the equipment after the parties signed an agreement which effectively banned the company from trespassing or installing cell phone fixtures without permission. However, in 2019, Sprint reneged on its agreement and once again installed antennas on Mr. Kerner's chimney. The installation caused considerable damage to Mr. Kerner's brownstone, leaving a trail of broken stones and a hole in the chimney. In addition, Sprint bolted electronic cabinets from the neighboring roof to Mr. Kerner's adjoining wall.

This is outrageous. Not only did Sprint not have Mr. Kerner's permission to use or alter his property in any way, it has not repaired the damage that its unauthorized work caused him. It is unacceptable for Sprint to trample the rights of homeowners in New York City and across the country. I request that the infrastructure on Mr. Kerner's chimney immediately be removed and the damage be fixed. I can be contacted at my district office at 212-873-6368 or rosenthall@nyassembly.gov. Thank you for your swift attention to this matter.

Emphasis added.

62.     Upon information and belief, neither Sprint's Chief Executive Officer nor anyone else at Sprint responded to Assemblywoman's Rosenthal's request nor did Sprint take swift or any other action in response.

**Conclusion: The Serious Violations and Ongoing Harm Persist Unabated and Unrelieved**

63.     Eight years after the agreement by Sprint in 2012 not to add new cell site equipment onto the Townhouse nor to encroach, Sprint has continued to do both wrongful activities.  It has continued doing so despite receiving multiple notices from Ninety Sixty and demands that Sprint relent from New York legislators with significant legislative responsibilities implicated by Sprint's misconduct.  Furthermore, Sprint has ignored the communications it received at the most senior levels of the company by which it has had actual knowledge at headquarters of its wrongdoing, and yet the company has not relented, it has not vacated Ninety Sixty's property and it has not corrected the harms it imposed.  In the process it has not only endangered the Kerners, who reside in the Townhouse, and damaged the Townhouse both inside and out, but it has also created a threat to public safety, necessitating the intervention of the New York City Police Department, the New York Fire Department and the Department of Buildings. In setting up its wrongful cell tower site, all for the purpose of generating revenue, it submitted false and misleading permit applications to the New York City regulatory authorities.  Absent this Court's intervention, there seems to be no end in sight to the wrongful conduct that Sprint has engaged in to maintain its cell tower site using Ninety Sixty's property.

## COUNT ONE
### Breach of Contract – Breach of the 2012 Agreement

64.     Ninety Sixty incorporates the allegations of ¶¶ 1 through 63 above into this paragraph as if they were fully re-written herein.

65.     On or about July 31, 2012, Ninety Sixty and Sprint entered into the 2012 Agreement.

66.     The 2012 Agreement is a valid and enforceable contract.

67.     Ninety Sixty has done all that it was required to do under the terms of the 2012 Agreement.

68.     Sprint materially breached the 2012 Agreement when it installed and affixed new or additional equipment to the Townhouse and in failing to remove its equipment from the Townhouse after due demand.

69.     Despite due demand by Ninety Sixty that Sprint comply with the terms of the 2012 Agreement by immediately removing the offending equipment, Sprint has failed to cure its material breach.

70.     Through the course of Sprint's material breach of the 2012 Agreement, Sprint's conduct in affixing cables, antennas and other equipment to the Townhouse has caused significant damage to the chimney and outer wall of the Townhouse.

71.     Pursuant to the terms of the 2012 Agreement, the prevailing party in this action is entitled to recovery of its attorney's fees.

72.     As a result of Sprint's material breaches of the 2012 Agreement, Ninety Sixty is entitled to compensatory damages well in excess of $75,000, plus interest, as well as its reasonable attorney's fees expended to enforce its rights, in an amount to be proven at trial of this matter.

## COUNT TWO
### Continual Trespass onto the Residential Property Owned by Ninety Sixty

73.     Ninety Sixty incorporates the allegations of ¶¶ 1 through 72 above into this paragraph as if they were fully re-written herein.

74.     Ninety Sixty is the owner of the Townhouse located at 317 West 77th Street, New York, NY.

75.     At all relevant times Ninety Sixty has been in ownership, occupancy, and possession of the Townhouse and has taken reasonable steps to utilize the property for its sole use to the exclusion of Sprint.

76.     At some point after July 31, 2012, on a more specific date to be determined at trial, Sprint, without justification or permission from Ninety Sixty, affixed certain telecommunications equipment to the western wall of the Townhouse which abuts the Adjacent Property.

77.     Sprint's action was knowing and intentional, and in reckless disregard of the rights of Ninety Sixty, as Sprint's telecommunications equipment was permanently secured to the Townhouse.

78.     Because the Townhouse's roof is one floor higher than the roof of the Adjacent Property, and a permanent safety and privacy fence was installed on the Townhouse between the two structures, Ninety Sixty was unable to see the telecommunications equipment that Sprint attached to the Townhouse west wall abutting the Adjacent Property.

79.     In or around April 2019, Ninety Sixty became aware that Sprint was proceeding to install additional telecommunications equipment at the Adjacent Property and in the course of investigating Sprint's conduct, Ninety Sixty discovered Sprint's trespass resulting from its attaching its equipment to the Townhouse.

80.     Ninety Sixty promptly demanded that Sprint remove such equipment forthwith.

81.     Notwithstanding various promises and representations that it would remove the offending equipment, Sprint failed to remove the equipment, which, upon information and belief, has been affixed to the Townhouse for a period of years to be determined at trial.

82.     Sprint's actions in attaching its telecommunications equipment to Ninety Sixty's property, along with its ongoing refusal to remove its equipment, constitutes a recurring, continuous, and sustained trespass.

83.     In addition to learning of Sprint's wrongdoing in attaching its telecommunications equipment to its property, Ninety Sixty, in or after April 2019, learned that Sprint's improper actions had caused material, physical property damage to the Townhouse.  Not only had the bricks and mortar of the outer wall been damaged by Sprint, but Sprint's actions caused significant damage to the Townhouse's chimney, which is now in danger of collapse.

84.     Due to Sprint's damage to the structural integrity of the chimney, Sprint directed its agent to install scaffolding at the front of the Townhouse in a purported step towards the repair of the damage it had caused.

85.     The scaffolding installed at Sprint's direction was improperly and negligently installed.  Due to the improper installation, the scaffolding detached from the Townhouse façade and the New York Fire Department and New York Police Department were summoned to the Townhouse and were required to take emergency measures to protect pedestrians and secure the scaffolding to prevent its collapse.

86.     In the course of securing the scaffolding, the New York Fire Department broke down the rooftop door at the Townhouse to gain access to the interior and caused additional

23

damage both inside and outside the Townhouse in their effort to protect the public from the imminent threat posed by Sprint's scaffolding.

87.     Ninety Sixty has been damaged by Sprint's ongoing and persistent trespass. In addition to the physical damages caused by Sprint's unauthorized use of Ninety Sixty's property, which total well in excess of $75,000, Ninety Sixty should be compensated for the fair market value of Sprint's unauthorized use of its property in an amount to be determined at trial.

WHEREFORE, Plaintiff, Ninety Sixty, demands that judgment be entered in its favor and against Defendants, Sprint and its successor in interest, T-Mobile, as follows:

(a)     Directing Defendants to immediately remove any and all of its equipment attached to Ninety Sixty's property;

(b)     Issuing permanent injunctive relief, both mandatory and prohibitory in nature, compelling Sprint's departure from the Townhouse, barring any and all future encroachments and any Sprint installations which subject the Townhouse to illegal levels of electromagnetic radiation, and ordering Sprint to disgorge the revenue it obtained as a result of its installation and use of Sprint equipment attached to the Townhouse;

(c)     Awarding Ninety Sixty monetary damages for Sprint's breach of the 2012 Agreement in an amount to be determined at trial, which damages are well in excess of $75,000 plus interest thereon;

(d)     Awarding Ninety Sixty monetary damages for the costs of obtaining all necessary permits and the cost of repairing the physical damages to the Townhouse, including but not limited to repairing the chimney, brickwork, façade, landscaping, the rooftop fence, the broken door, wall and doorjamb, the broken window, and the interior damage, in an amount to be determined at trial, which damages are well in excess of $75,000;

(e)     Awarding Ninety Sixty monetary damages for the unauthorized continued use of its property as measured by the fair market value of such use, from the date of its first unauthorized use through and including the date that it fully and completely vacates Plaintiff's property, plus interest, which amount is well in excess of $75,000 plus interest thereon;

(f)     Awarding Ninety Sixty punitive or exemplary damages for Sprint's ongoing and continuous conduct and in failing to rectify its transgressions after repeated demands for corrective action, of no less than $2,000,000;

(g)     Awarding Ninety Sixty its attorney fees, as assessed against Sprint and its successor in interest, T-Mobile, associated with the commencement and prosecution of this matter; and

(h)     Granting such further and additional relief in law and in equity as the Court deems just and equitable.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  June 1, 2020                              Respectfully submitted,


/s/ Steven S. Kaufman
    Steven S. Kaufman (SK0413)
    Paul R. Dehmel (PD2711)
    **ULMER & BERNE LLP**
    420 Lexington Avenue, Suite 2733
    New York, NY 10170
    Ph: 917-262-0470 | Fax: 917-262-0480
    skaufman@ulmer.com
    pdehmel@ulmer.com

Attorneys for Ninety Sixty LLC

CLEV1997:2636853v4
36055.00000